IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HOME SOLUTIONS OF AMERICA INVESTOR GROUP, On Behalf of Themselves and All Others Similarly Situated. | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-1096-N |
| | § | |
| FRANK J. FRADELLA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

This Order addresses the motion to dismiss [42] of defendants Frank J. Fradella, Jeffrey M. Mattich, Rick J. O'Brien, Home Solutions of America, Brian Marshall, and Charles P. McCusker, (collectively, "Home Solutions") and the motion to dismiss [40] of defendants Michael Chadwick and Sanders Morris Harris Group Inc. ("Sanders Morris") (collectively, "Defendants"). Plaintiff Home Solutions of America Investor Group's (the "Investors") have not stated a section 10(b) claim against Sanders Morris, but because Sanders Morris does not directly address the Investors' section 20(a) claims, the Court grants in part and denies in part its motion [40]. Furthermore, with respect to the Investors' section 10(b) claims, only the claims regarding the May 23rd press release, and only as against Fradella and the Home Solutions corporate entity, are adequately pleaded. Home Solutions has also not directly addressed the Investors section 20(a) claims. The Court therefore grants in part and denies in part Home Solutions's motion [42].

## I. THE ALLEGED RULE 10B-5 VIOLATIONS

The Investors bring this putative class action against Home Solutions and the company's directors and senior officers: Chief Executive Officer and Chairman of the Board Fradella, Senior Vice President and Chief Financial Officer Mattich, President, Chief Operating Officer, and Secretary O'Brien, and Directors Marshall, Chadwick, and McCusker. The Investors also target Home Solutions's analyst, Sanders Morris. Home Solutions is a provider of recovery, restoration, and rebuilding/remodeling services to commercial and residential areas that are prone to weather disasters and/or experiencing robust housing development. The Investors allege that Defendants are responsible for a number of misrepresentations that artificially inflated the price of Home Solutions stock and that the Investors suffered losses when the eventual emergence of the truth caused the share price to drop. The Investors describe the misrepresentations as occurring in two main groups. The first group consists of the following:

1. An April 11, 2006 Home Solutions press release announcing the acquisition of two contracts from C&B Services ("C&B"), each valued at up to twenty million dollars (the "Up-to-Twenty-Million-Dollar Contracts"). The Investors, relying on the fact that a "former C&B project manager," "former C&B labor coordinator," and "former C&B principal" deemed the acquisition of two twenty million dollar contracts highly unlikely in light of the little work C&B had at the time, allege that Home Solutions never actually acquired the two contracts. The Investors suggest – due to what evidence, the Court is uncertain – that the forty million

dollars the press release refers to is simply forty million dollars that C&B Services was attempting to recover from the government for its past work in 2005.

2. An April 20, 2006 Home Solutions press release announcing a Home Solutions wholly owned subsidiary's acquisition of additional contracts from Home Depot (the "Home Depot Contracts"). The Investors allege that Don Harrison, a Home Depot public relations manager, immediately emailed Home Solutions protesting that there were no such contracts. The Investors also rely on anonymous employees of the Home Solutions subsidiary, including a "manager who had worked for Home Depot," to allege that Home Solutions was having trouble meeting its original obligations with Home Depot, that the relationship was therefore deteriorating, and thus that any award of additional contracts would have been unlikely.

3. A May 4, 2006 Sanders Morris Analyst Report in which Sanders used the Up-to-Twenty-Million-Dollar Contracts as justification for predicting high profits for Home Solutions. The Investors allege that Sanders Morris was motivated to misrepresent Home Solutions's prospects because Sanders Morris was Home Solutions's placement agent. The Investors further allege that Sanders Morris knew the information was false because Chadwick, a senior vice-president and managing director[1] for Sanders Morris, was on Home Solutions's board.

---

[1]Sander Morris explains in its briefing that "managing director" is a job within Sanders Morris that does not include, as the Investors suggest, being on or managing the board.

ORDER – PAGE 3

4. A May 15, 2006 Home Solutions guidance statement predicting greater success in part because of the Up-to-Twenty-Million-Dollar Contracts and the Home Depot Contracts. The investors allege that the guidance statement was false and misleading because neither of those contracts were real. The release also stated that Home Solutions had record first quarter net income. The Investors allege that the report of record income was false because it included a fraudulent transfer of uncollectible accounts from one of its subsidiaries to another company (the "Fraudulent Transfer").

5. A May 23 Home Solutions press release. This fifth alleged misrepresentation is complicated and represents the backbone of the Investors' complaint. The press release announced that Home Solutions[2] had been awarded a contract by American Renaissance Homes ("ARH"), a provider of affordable housing, to be the exclusive provider of delivery and installation services for modular housing in New Orleans and surrounding areas. Fradella was quoted as saying, "I am pleased that ARH has selected the Company as the exclusive provider of installation services for the program." The Investors allege that Fradella and O'Brien began selling a large amount of Home Solutions stock immediately after the press release. On June 2, 2006, Stocklemon, a website reporting on stocks, published a report questioning the market's high valuation of Home Solutions. Included were allegations that Fradella and O'Brien had sold a large amount of stock. Home Solutions responded with a June 5, 2006 release that explained the stock sales as being for

---

[2]The press release actually announced that the contract had been awarded to Home Solutions's subsidiary.

diversification and estate planning purposes and again cited the Up-to-Twenty-Million-Dollar Contracts and the Home Depot Contracts to justify its predictions of prosperity.

On June 6, 2006, Stocklemon fought back with another report, this time alleging that Home Solutions's announcement of its contract with ARH was misleading.  ARH, according to Stocklemon,[3] was not an independent and established company that had "selected" Home Solutions as the exclusive provider.  Instead, according to Stocklemon, Home Solutions actually owned 40% of ARH – a company that had no business, had no working phone number, and was incorporated only five days before Home Solutions's May 23rd announcement.

That same day, June 6th, Home Solutions responded to the Stocklemon report.  The Investors describe the response as essentially admitting, with a positive spin, the truth of Stocklemon's allegations.  The response stated that although Home Solutions had been discussing the acquisition of an ownership stake in ARH, it had not yet done so – up until then it had only agreed to loan ARH up to $800,000 in working capital.[4]  Home Solutions did not deny the rest of Stocklemon's allegations.  The market responded unfavorably to the June

---

[3]Stocklemon's source for this information was Alan Nazzaro, the Chief Operating Officer for ARH.

[4]The next day, June 7th, Stocklemon issued one last report.  In response to Home Solutions's denying a 40% ownership stake in ARH, Stocklemon wrote, "No matter how you slice it, ARH is exclusively funded by [Home Solutions] and if they have not worked out their official ownership position, we understand – considering that ARH is not even 3 weeks old."

6th exchange between Stocklemon and Home Solutions, with Home Solutions's share price opening at $10 but closing at $6.80.

The Investors' tale of misrepresentations does not end there. They allege a second group of misrepresentations. This second group consists of the following:

6. A June 7, 2006 Sanders Morris analyst report. A day after Home Solutions's share price dropped to $6.80, Sanders Morris reiterated its buy recommendation and expressed even greater confidence in Home Solutions. The Investors allege that Sanders Morris issued the report because of an inappropriate relationship with Home Solutions – primarily Chadwick's connection to both companies. The Investors also allege that the report pushed the share price to $7.94.

7. A June 16, 2006 shareholders meeting at which Home Solutions again predicted it would soon see significant success. The Investors again allege that, because there actually were no Up-to-Twenty-Million-Dollar Contracts or Home Depot Contracts, Home Solutions had no basis for making the guidance statement.

8. A July 31, 2006 Home Solutions press release announcing the acquisition of Fireline Restoration, Inc. ("Fireline"). Home Solutions stated that Fireline had "unaudited revenue for the first six months of 2006 of approximately $21 million and EBITDA of $5 million." The release also described many benefits, such as the "scale necessary to participate in projects with significant size," that the acquisition of Fireline would yield. The Investors allege that the release was false and misleading because Fireline was, "as a

practical matter, insolvent," and that the insolvency would have been apparent had Home Solutions not withheld Fireline's June 30, 2006 balance sheet.

     9.  An August 14, 2006 Home Solutions press release reiterating its optimistic predictions.  The Investors again allege that there was no reasonable basis for the guidance statement.

     10.  An August 15, 2006 filing with the SEC describing the Up-to-Twenty-Million-Dollar Contracts, the Home Depot Contracts, and the Fraudulent Transfer.

     11.  A November 14, 2006 reiteration of Home Solutions's optimistic guidance.  The Investors allege that Home Solutions had no reasonable basis for their predictions.[5]

     The Investors allege that Home Solutions's scam to inflate the price of its stock came to complete halt on March 5, 2007, when Home Solutions announced that it had fallen short of its 2006 guidance statements.  Home Solutions's share price dropped, with heavy trading, from a $5.87 closing on March 2, 2007 to a $4.91 closing on March 5.  The Defendants move to dismiss the complaint for failure to meet the standards set by the Private Securities Litigation Reform Act (the "PSLRA").

## II.  ALMOST ALL OF THE INVESTORS' SECTION 10(B) CLAIMS FAIL

     Each of the Investors claims, except the claim focused on Home Solutions's May 23rd announcement, fail to state a claim on account of multiple deficiencies.  "In order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the

---

[5]In their briefing, the Investors make allegations concerning Home Solutions's internal controls.  Because the allegations were entirely absent from the complaint, the Court does not consider them.

purchase or sale of securities: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately injured him." *Cent. Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 550 (5th Cir. 2007). Rather than describe every manner in which the Investors have failed to meet this standard, the Court dismisses each deficiently pled claim on the basis of its most evident shortcoming.

### A. The Investors' Claims Regarding the Up-to-Twenty-Million-Dollar Contacts and the Home Depot Contracts Fail Because the Investors Have Not Adequately Alleged a Misstatement or Omission of a Material Fact

It is not enough that a plaintiff alleges that a defendant's statement is untrue. A plaintiff must also specify "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts upon which that belief is formed." 15 U.S.C. § 78u-4(b)(3). If the belief is formed on the basis of confidential sources, the plaintiff must plead specific facts "to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 358 (5th Cir. 2002).

*1. The Up-to-Twenty-Million-Dollar Contracts.* The Investors have not adequately alleged that Home Solutions's statements regarding the Up-to-Twenty-Million-Dollar Contracts from C&B were false or misleading. Their argument otherwise depends on two unwarranted moves. First, the Investors strain to ignore the fact that every time Home Solutions mentioned the contracts, Home Solutions always referred to them as being worth *up to* twenty million dollars each. Home Solutions did not – as the Investors would have it

– claim that the contracts were *definitely* worth twenty million dollars.  Second, the Investors

rely on an anonymous former C&B project manager, former labor coordinator, and former

principal.  These individuals allegedly had no knowledge of "the two contracts worth $40

million and, given the slow down in 2006, deemed the award of any such contracts to be

highly unlikely."  *See* Plaintiffs' Response at 3.  The Investors have made no attempt to show

that these confidential sources would have been in a position to know about the contracts.

Furthermore, the sources don't even deny the existence of contracts worth up to forty million

dollars– they simply *doubt* the existence of contracts *worth* $40 million dollars.  *See id.*

Accordingly, the Court dismisses the Investors' claims based on the Up-to-Twenty-Million-

Dollar Contracts.

     2. ***The Home Depot Contracts.***  The Investors have not adequately alleged that Home

Solutions's statements regarding the acquisition of contracts from Home Depot were false

or misleading.  Home Solutions argues that the Investors' have failed to "state with

particularity all facts upon which [their] belief is formed."  15 U.S.C. § 78u-4(b)(3).  The

Investors vaguely reference an email allegedly sent by Don Harrison, a Home Depot public

relations manager, that supposedly objected to Home Solutions's announcement of the

contracts.  The Investors offer no detail as to the actual contents of the alleged email, and

they wholly fail to explain how they formed their belief as to the email's existence.  In

subsequent briefing the Investors suggest, though appear to carefully refrain from outright

declaring, that Don Harrison – rather than an anonymous individual – is their actual source.

Ultimately, the Court is unable to discern the facts upon which the Investors have formed

their belief that Home Solutions lied about the Home Depot Contracts. The Investors' vagaries, ambiguities, and omissions are insufficient under the PSLRA, and the Court finds that the Investors have failed to state with particularity all facts upon which their belief was formed.[6] Accordingly, the Court dismisses the claims alleging that Home Solutions fraudulently reported acquisition of the Home Depot Contracts.

### B. The Investors' Claims Regarding the Fireline Acquisition and the Fraudulent Transfer Fail Because the Investors Have Not Alleged Loss Causation

To state a section 10(b) claim under the PSLRA, a plaintiff must allege loss causation, i.e., the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Investors have failed to allege such a connection with respect to at least two of their claims.

*1. The Fireline Acquisition.* The "misrepresented" facts, namely that the withheld June 30, 2006 balance sheet and the unaudited financial statements would have shown that Fireline was "practically insolvent," were disclosed to the market October 16 and 20 of 2006. The market did not respond, and the Investors have offered no theory to save them from the unresponsive market, e.g., that the facts weren't *effectively* disclosed to the market until much later.[7] Without an allegation that the misstatement actually moved the market, the Investors'

---

[6]The fact that a "manager who had worked for Home Depot," told the Investors that the relationship between the companies was strained does not help the Investors either. Such a sparse and vague description fails to meet the standard set by the PSLRA.

[7]The Investors also do not allege that the stock price increased immediately after the representation was made. Alleging such a fact would at least have helped them in their attempt to plead loss causation. *See infra* at 21-24.

claim fails. *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 265 (5th Cir. 2007) ("[W]e require proof that the misstatement *actually moved* the market.") (emphasis in original).

**2. The Fraudulent Transfer.**  As briefly described earlier, *supra* at 3-4, the Investors allege that Home Solutions misrepresented its first quarter income for 2006 because it included a "fraudulent transfer of uncollectible accounts receivable" from one its subsidiaries (Cornerstone B&R) to another company.[8]  The Court agrees with Home Solutions that the Investors' allegation "simply makes no sense" and that the Investors "do not explain why there is anything remotely improper about [the] transaction."  Equally important is that there is simply no allegation of loss causation: the transaction was disclosed in Home Solutions's public SEC filings during 2006, *see* Home Solutions's Exhibit K at 13, and the Investors make no allegation that the market moved in response to the disclosures.  Accordingly, the Court dismisses the claim based on the Fraudulent Transfer.

### C.  A Number of the Claims Fail Because the Challenged Statements are Protected by the Statutory Safe Harbor for Forward-Looking Statements

The PSLRA provides defendants protection for liability for forward-looking statements that are identified as forward-looking statements and that are accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially.  15 U.S.C. § 78u-5(c)(1).  If a statement "qualifies as 'forward-looking'

---

[8]The Investors allege some other improprieties in connection with the subsidiary Cornerstone B&R, but the Court's best efforts have been unable to connect the alleged improprieties with any misleading statements.  The allegations are thus inappropriate for the Investors' Section 10(b) and Rule 10b-5 causes of action.

ORDER – PAGE 11

and is accompanied by sufficient cautionary language, a defendant's statement is protected

regardless of the actual state of mind." *Miller v. Champion Enterprises Inc.*, 346 F.3d 660,

672 (6th Cir. 2003); *see also Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F.

Supp.2d 151, 161 (N.D. Tex. 2007). A "forward-looking statement" includes:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

15 U.S.C. § 78u-5(i)(1)(A) - (C). Although the statute fails to define what constitutes the

"meaningful cautionary language" that must accompany forward-looking statements, the

Fifth Circuit has explained that "[t]he requirement for 'meaningful' cautions calls for

'substantive' company-specific warnings based on a realistic description of the risks

applicable to the particular circumstances, not merely a boilerplate litany of generally

applicable risk factors." *Southland Sec. Corp. v. INSpire Ins. Solutions*, 365 F.3d 353, 372

(5th Cir. 2004).

    *1. Home Solutions's Guidance Statements.* The Investors' fail in their arguments

that Home Solutions is not protected by the PSLRA's "safe harbor." The Investors' primary

argument is that the guidance statement predictions are not forward-looking because they are

intertwined with and justified by the Up-to-Twenty Million Dollar Contracts and the Home

Depot Contracts – described by the Investors as misstatements of existing fact. Because the

Court has already held that Home Solutions's representations concerning those contracts were not false or misleading, *supra* at 8-9, this first argument has no traction.[9]

The Investors' also fail with their alternative argument that the cautionary language accompanying the guidance statements is insufficient. Home Solutions included the following language:

> Statements included in this update that are not historical in nature are intended to be, and are hereby identified as, "forward-looking statements" for purposes of the safe harbor provided by Section 21E of the Securities Exchange Act of 1934, as amended by Public Law 104-67. Forward-looking statements may be identified by words including "anticipate," "believe," "intends," "estimates," "expect," and similar expressions. The Company cautions readers that forward-looking statements including, without limitation, those relating to the Company's future business prospects are subject to certain risks and uncertainties that could cause actual results to differ materially from those indicated in the forward-looking statements, due to factors such as those relating to economic, governmental, technological, and other risks and factors identified from time to time in the Company's reports filed with the SEC.

---

[9]Even if the portions of the guidance statements making predictions – which are indisputably forward-looking – were enmeshed with misstatements of existing fact, it is not at all clear that they should lose the PSLRA's safe harbor protection. Arguing otherwise, the Investors cite *In re Blockbuster Sec. Litig.*, 2004 WL 884308 (N.D. Tex. April 26, 2004). That case does not, as the Investors argue, require a court to treat a forward-looking statement as a statement of existing fact simply because it is intertwined with one. In fact, the *In re Blockbuster* Court does not even address that question. It explained that a court should not treat a statement of existing fact as a forward-looking statement simply because the statement of existing fact is intertwined with a forward-looking statement. *Id.* at *9. The Court agrees with that analysis, but it also agrees with its implicit corollary: a court should not treat a forward-looking statement as a statement of existing fact simply because it is intertwined with one. The Court can simply identify the forward-looking elements and the existing-fact elements of a "mixed statement" and treat each appropriately: forward-looking as forward-looking and existing-fact as existing-fact.

*See* Investors' Response at 25. While the Investors may be correct that the language is "boilerplate," the language in the SEC filings incorporated by reference is not.[10] Courts in this district have routinely found the safe harbor applicable when the required "meaningful cautionary language" was contained in SEC filings that were incorporated by reference. *See, e.g., In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 886 (N.D. Tex. 2005); *see also In re Michael's Stores, Inc. Sec. Litig.*, 2004 WL 2851782, at *15 (N.D. Tex. Dec. 10, 2004). The Investors wholly fail to consider the more specific language from the SEC filings. The Court accordingly dismisses the claims based on Home Solutions's guidance statements.

  ***2. The Sanders Morris Analyst Reports.*** The statements by Sanders Morris are forward-looking statements. The Investors fail even to respond to Sanders Morris's arguments that it is protected by the PSLRA's safe harbor; they merely state in footnote that their arguments directed at Home Solutions's guidance statements "equally apply to Sanders Morris." Insofar as that is true, the Investors allegations against Sanders Morris fail for the same reasons they fail against Home Solutions. To the extent that it is not true, i.e., to the extent that Sanders Morris has its own cautionary language, Sanders Morris is still protected by the safe harbor. The Sanders Morris statements are replete with not only industry-

---

  [10]The SEC filings contain numerous pages of disclosures, including the following industry-specific warnings: (1) "If we fail to win contracts that are ultimately reimbursable by insurers and federal, state and local governments, it may impede our ability to grow," (2) "[i]f insurance proceeds and federal funds are not available to our customers, then our revenues may decline," and (3) "[i]f the demand for [recovery, restoration and rebuilding/remodeling services] decreases, our revenues could decline."

specific, but company-specific warnings.[11]  The Court accordingly dismisses all Rule 10b-5

claims against Sanders Morris and Chadwick.[12]

### III. THE INVESTORS' ALLEGATIONS CONCERNING THE MAY 23 PRESS RELEASE STATE A CLAIM ONLY AGAINST FRADELLA

Home Solutions makes three arguments against the Investors' allegations of false

representations in the announcement of Home Solutions's contract with ARH.  First, Home

Solutions argues that the Investors did not plead facts supporting a strong inference of

scienter.  This argument succeeds as to defendants Mattich, Marshall, McCusker, and

O'Brien, but not as to Fradella.  Second, Home Solutions unconvincingly argues that the

---

[11]The warnings include the following: (1) "the relatively limited operating history of the company," (2) "two customers represent an important percentage of Home Solutions's revenue," and (3) "weather is volatile, leading to uncertainty in the company's returns."  *See* Sanders Morris Appendix at 5-6.

[12]The Investors' claims against Sanders Morris and Chadwick are also insufficient because they have do not meet the requirements of Federal Rule of Civil Procedure 9(b). When asserting claims under Section 10(b), plaintiffs must satisfy the heightened pleading requirements of Rule 9(b).  *ABC Arbitrage*, 291 F.3d at 349-50.  Rule 9(b) requires certain minimum allegations to be pled in securities fraud cases including the specific place, time, and content of the false representations as well as the identity of the individual making the false representations and what the person gained from making the representations. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993).  Vague and general pleadings are inadequate; plaintiffs must distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud. *Southland*, 365 F.3d at 372.

The Investors' allegations regarding Sanders Morris and Chadwick are vague and general.  Rather than identifying who made the alleged misrepresentations and what the speaker had to gain by making the misrepresentations, the Investors merely point in the general direction of Sanders Morris and suggest that Chadwick's relationship with Home Solutions *somehow* caused Sanders Morris's analyst division to issue false reports.  The Investors' hope in "somehow" would be misplaced even under the most favorable circumstances, but here, the circumstances are not favorable:  Chadwick is not even a member of the Sanders Morris analyst division – he is a managing director in the investment banking department.

press release was not false or misleading.  Third, the company unsuccessfully argues that the

Investors are not entitled to the fraud-on-the-market presumption of reliance.

### A.  The Complaint Adequately Alleges that the May 23 Press Release Was False and Misleading

The May 23 press release stated, in relevant part:

Home Solutions Restoration of Louisiana Inc. (HSLRA), has been awarded a contract by American Renaissance Homes (ARH), a provider of delivery and installation services for modular housing in New Orleans and surrounding areas.  ARH will provide the planning, sales and secure the modular homes, while HSLRA will provide the labor and expertise in delivering the modular homes and installing them.  The parties anticipate that St. Bernard Parish, located near the city of New Orleans, will be the initial market, with 75 homes initially being installed per month.  ARH estimates that St. Bernard Parish requires up to 17,000 homes to provide shelter for those affected by Hurricane Katrina.

"As a resident of New Orleans, I have seen up close the devastation caused by Hurricane Katrina and the resulting displacement of thousands of families," said Frank J. Fradella, Chairman and CEO of Home Solutions.  "I am pleased that ARH as selected the Company as the exclusive provider of installation service for the program.  We are now seeing signs that funding is becoming available to rebuild New Orleans.  With so much demand from working class families for affordable permanent housing, we believe that the model that has been developed for St. Bernard Parish can quickly be replicated in other parts of the City and surrounding areas."

Currently, many New Orleans area residents live in 200 square foot trailers provided by FEMA.  ARH will provide homes between 1,200 and 2,300 square feet at a fraction of the cost of construction in the area, which is currently approaching $150 per square foot.  The cost to FEMA to install and maintain a trailer is estimated to be approximately $75,000.  HSLRA has agreed to provide a small portion of the working capital required to secure the land and modular homes in return for being the sole provider of installation and delivery services for the homes.

*See* Plaintiffs' Complaint at 21.

ORDER – PAGE 16

The Investors allege that the press release was misleading because it gave the false impression that Home Solutions was awarded business by an independent and established company with business of its own.  According to the Investors, ARH was in reality a company with no business of its own, a company without even a working phone number, and a company that had been incorporated only five days before the press release.  They further allege that Home Solutions had done much more than "provide a small portion of the working capital" for ARH; they allege that Home Solutions provided ARH with almost all of its capital and a was 40% owner.  In short, the Investors allege that the "contract" with ARH, though represented as an arm's length deal with another company worthy of a press release, was essentially a contract between Home Solutions and itself to conduct its regular business, i.e., nothing noteworthy.

Home Solutions's arguments that the press release was not misleading are unavailing. First, Home Solutions argues that the press release "made expressly clear" that the venture between it and ARH was a "brand-new" business venture.  But the Investors are not challenging that innocuous representation.  Instead, they challenge Home Solutions's misleading impression that ARH was an independent and established company capable of awarding business to Home Solutions.  Second, Home Solutions takes issue with the allegation that it was a 40% owner of ARH.  Home Solutions argues that the Investors' source, Stocklemon, has abandoned that allegation, and thus that the Investors have no foundation for the allegation.  The Court agrees but finds the issue of no consequence.  For purposes of determining whether the press release was misleading, it makes no difference

whether Home Solutions was actually a 40% owner or whether it was negotiating for an ownership stake[13] as ARH's only real source of capital. The result is the same: ARH was not, as Home Solutions represented, an independent company for whom Home Solutions was providing only a "small portion of the working capital." Accordingly, the Court finds that the Complaint sufficiently alleges that press release was misleading.[14]

### B. The Investors' Have Pled Facts Supporting a Strong Inference of Scienter Only With Respect to Fradella

Liability under Rule 10b-5 requires a defendant to have made a misrepresentation "with 'scienter,' meaning intent to deceive, manipulate, or defraud or that 'severe recklessness' in which danger of misleading buyers or sellers is either known to defendant or is so obvious that defendant must have been aware of it." *Southland*, 365 F.3d at 366. Plaintiffs must state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ___ U.S. ___, 127 S. Ct. 2499, 2504 (2007). To qualify as *strong*, an inference must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 2505.

---

[13]In a subsequent press release, Home Solutions admitted that it had been in ownership discussions with ARH.

[14]Of comfort to the Court is the market's evident agreement that the press release was misleading. Upon the disclosure of the relevant facts, Home Solutions's share price dropped from $10 to $6.80. If, as Home Solutions would have the Court believe, all the May 23rd press release required was a little "clarification," one would not have expected the share price to respond so severely to the supposedly minor disclosures.

*1. Mattich, Marshall, McCusker and O'Brien*.  The Investors' allegations do not support a strong inference of scienter with respect to defendants Mattich, Marshall, McCusker, and O'Brien.  The Investors do not even allege that these four defendants were involved in making the allegedly false representations in the May 23 press release – much less that these four defendants made those representations with scienter.  The Fifth Circuit does not permit corporate officers to "be held responsible for unattributed corporate statements solely on the basis of their titles." *Southland*, 365 F.3d at 365.  Instead, plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Id*. (emphasis in original).  Because the Investors have failed to comply with this requirement, their Rule 10b-5 claim against Mattich, Marshall, McCusker, and O'Brien[15] arising from the May 23 press release is dismissed.[16]

*2. Fradella.*  The Investors have pled facts supporting a strong inference that Fradella acted with scienter when he made false representations in the May 23 press release.  As discussed above, *see supra* Section III(B), the Investors have adequately alleged that

---

[15]The Investors allege that O'Brien engaged in unusual trading of Home Solutions's stocks immediately after the May 23 press release.  Unfortunately for the Investors, this is the only time O'Brien is mentioned in conjunction with that release, and he is scarcely mentioned elsewhere in the complaint; the Investors' "allegations of motive and opportunity, standing alone, cannot give rise to the necessary strong inference." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

[16]The Investors argue that a number of form 8-K's signed by Mattich and Marshall provide support for a strong inference of scienter.  While the argument might have helped the Investors with the other alleged misrepresentations (which the Court has dismissed on other grounds), it does not help them with their claims based on the May 23 press release because none of the cited forms refer to the representations contained in the press release.

representations made in the May 23 press release were false and misleading due to material omissions. Given this, it is readily apparent that the Investors have pled facts supporting a strong inference of scienter. Most importantly, Fradella is extensively quoted in the press release. His comments reflect substantial familiarity with the arrangement between Home Solutions and ARH, indicating that Fradella knew the press release was misleading. Furthermore, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511 (2007). Fradella engaged in significant and unusual trading in Home Solutions stock after the press release was issued.[17] Viewing the allegations collectively, the Court finds that the Investors have pled facts supporting a strong inference that Fradella acted with scienter.

---

[17]Home Solutions points out that its share price did not actually rise after the press release, and the company argues that this fact undermines the Investors' argument that Fradella's trading enhanced the inference of scienter. While it does weaken the Investors' argument, it does not dispense with it. First, Fradella's alleged plan artificially to increase the share price and sell shares might have continued despite the fact that his attempt to increase the price failed: at the very least, he would still be better off selling his shares immediately rather than waiting for the market to discover alleged omissions in the press release (upon which one would expect the share price to drop). Second, the Investors argue that the share price would have risen except that it was depressed by insiders selling over one million shares in three days. At this early stage, the Court cannot foreclose such an argument.

Furthermore, Home Solutions's bare claim that O'Brien and Fradella both began to sell a significant portion of their holdings for diversification and estate planning purposes does little to weaken the inference of scienter. The same can be said of Home Solutions's claim that O'Brien and Fradella also purchased large amounts of stock: those purchases were allegedly made through the exercise of stock options at a strike price well below the then-market price.

### C.  At this Early Stage, the Investors Are Entitled to the
### Fraud-on-the-Market Presumption of Reliance

In order to proceed with the fraud-on-the-market theory of reliance, Investors must allege that the May 23 misrepresentations "actually moved the market."  The Supreme Court in *Basic* adopted the fraud-on-the-market theory and held that reliance is presumed if the plaintiffs can show that "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed." *Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988).  However, *Basic* also "allows each of the circuits room to develop its own fraud-on-the-market rules."  *Oscar*, 487 F.3d at 264.  The Fifth Circuit "has used this room . . . to tighten the requirements . . . . [The Court] now require[s] . . . proof that the misstatement *actually moved* the market."  *Id.* at 264-65 (emphasis in original).  "Essentially, [the Court] require[s] plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption."  *Id.* at 265.

Home Solutions argues that because the Investors failed to allege that Home Solutions's stock price increased after the May 23rd misrepresentations, the Investors have not adequately alleged that the misrepresentations actually moved the market and may therefore not proceed under the fraud-on-the-market theory of reliance.  According to Home Solutions, the Investors may only proceed with the fraud-on-the-market theory if they allege both (1) that the stock price increased upon release of the falsely positive representations concerning ARH, *and* (2) that the stock price subsequently decreased upon disclosure of the truth.  According to Home Solutions, only a complaint that meets both of these requirements

succeeds in alleging that a misrepresentation *actually moved* the stock price. Although Home Solutions makes no argument that the Investors have failed to comply with the second requirement, they argue that Investors have failed to meet the first.

It is unclear whether the requirements are conjunctive, i.e., whether plaintiffs must allege both an increase and a decrease. The Fifth Circuit has sometimes used language suggesting that plaintiffs must allege both. For example, the Court has stated that "the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004). But the Fifth Circuit has also suggested that the requirements are disjunctive: "[Fraud on the market] is usually shown by an increase in the stock price immediately following the release of positive information. We read *Nathenson* to *also* allow plaintiffs to make this showing by reference to actual negative movement in stock price following the release of the alleged 'truth' of the earlier misrepresentation." *Id.* at 665 (emphasis added).

The solution to the puzzle is not, as Home Solutions would have it, that plaintiffs face an absolute requirement to clearly plead both an increase and a decrease. Rather, the increase and decrease in stock price are two cardinal factors to consider in determining whether the misstatements "actually moved the market" – or, at the motion to dismiss stage, whether plaintiffs have pled facts sufficient to "raise a reasonable expectation that discovery will reveal evidence" that the misstatements actually moved the market. *See Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965, 1974 (2007). Theoretically, there should be both an increase and a decrease, but, because it is accepted that either may be difficult to

accurately detect, courts permit evidence of one to serve as surrogate for the other. For example, disclosure of a previously misrepresented truth may be accompanied by other negative disclosures, making it difficult to determine whether a decrease in stock price is caused by the former or the latter. If plaintiffs allege or show that the prior misrepresentation was accompanied by a sharp increase in the price of stock, this indicates that the stock price fell due to the corrective disclosure and not because of the unrelated negative disclosure. There may also be circumstance in which a company simultaneously releases false positive news and true negative news. Although the share price may remain the same, the false positive news may have nonetheless "actually moved the market," but the movement may not have been visible because the negative news moved the market in the opposite direction. If the stock price decreases upon a corrective disclosure, that is evidence that the false positive news actually did move the market, even though one would not be able to detect that movement by merely looking at the stock price immediately before and after the release of the false positive news.[18]

The Investors argue that a version of this dynamic is at work in this case. They argue that the May 23 press release actually did "move" the market, but that this movement was hidden by the downward pressure created by Fradella and O'Brien's significant sales of their

---

[18]The Fifth Circuit has provided yet another example: "For example, if the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall)." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). The Court explained that, in such circumstances, a plaintiff would not have to allege a visible increase in the share price.

Home Solutions stock. According to the Investors, that the share price fell dramatically after the June 6 corrective disclosures is evidence that the initial press release actually did increase the price – it only appears otherwise because the increase was offset by the decrease caused by Fradella and O'Brien's sales.[19]

In light of the sharp decrease in Home Solutions's share price after the corrective disclosures and the possibility that the corresponding increase was rendered invisible by Fradella and O'Brien's stock sales, the Court finds that the Investors have alleged facts sufficient to trigger the fraud-on-the-market presumption.[20]

---

[19]Home Solutions opposes the Investors' interpretation. It explains that the price did not increase "immediately after" the press release even though Fradella and O'Brien had not yet started selling, and it argues that "Plaintiffs' efforts to attribute the lack of a price increase on May 23 to the sales on May 24-26 are without merit." The Court cannot make such a determination in response to a motion to dismiss, but it notes that another court deemed "immediately after" to mean "two days after" rather than, as Home Solutions wishes, "one night after." *See In re Crossroads Systems, Inc. Sec. Litig.*, 2002 WL 32005236, at *1 (W.D. Tex. Nov. 22, 2002), *aff'd in part and vacated in part, Greenberg*, 364 F.3d 657.

[20]It is noteworthy that Home Solutions does not argue that the Investors have failed to allege loss causation with respect to the May 23rd press release, even though they make that argument with respect to other of the Investors' claims. The Court assumes that they have not done so because it is fairly evident that the Investors' allegations are sufficient. This speaks strongly against its argument here; Home Solutions fails to realize that a defendant may rarely concede loss causation and simultaneously argue against the fraud-on-the-market presumption of reliance. *See Oscar*, 487 F.3d at 265 ("Essentially, we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption").

## IV.  THE COURT DOES NOT DISMISS THE INVESTORS' SECTION 20(A) CLAIMS

Defendants' argument against the Investors' section 20(a) claims is entirely predicated on the absence of any section 10(b) claim.  Because the Court has concluded that the Investors have stated a section 10(b) claim, the Defendants' argument fails.

### CONCLUSION

For the reasons described above, the Court dismisses Investors' section 10(b) claims against Sanders Morris, Chadwick, Mattich, O'Brien, Marshall, and McCusker.  The Court further dismisses each section 10(b) claim against Fradella and the Home Solutions corporate entity, except the claim involving the May 23 press release.  The Investors' section 20(a) claims remain viable.  The Court therefore grants in part and denies in part Sanders Morris's motion to dismiss [40] and grants in part and denies in part Home Solutions's motion to dismiss [42].  Furthermore, the Court grants the Investors' request for leave to amend their complaint in response to this Order and orders that any such amended complaint be filed within thirty (30) days from the date of this Order.

Signed March 24, 2008.

David C. Godbey
United States District Judge

ORDER – PAGE 25